# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

POGO, INC.,                          )
                                     )
          Plaintiff,                 )     Case No.  18-1469 C
                                     )
     v.                              )     Judge  _____
                                     )
THE UNITED STATES,                   )
                                     )
          Defendant.                 )

## **COMPLAINT**

Pogo, Inc. ("Pogo"), by counsel, hereby files this Complaint against the United States, acting by and through the Department of Defense, the Department of the Navy, and the United States Marine Corps ("Marine Corps"), and states as follows:

### **Nature of the Action**

1.   This action is an appeal ("direct action") from the Marine Corps contracting officer's May 31, 2018, final decision denying Pogo's certified claim for $761,214.74 under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101 et seq.  Pogo requests that the Court grant Pogo's claim for monetary damages in its entirety (or an amount to be proved at trial).  Pogo's claim represents damages that Pogo incurred in providing truck and bus drivers under an MCB Camp Pendleton task

order (Task Order No. M00681-14-F-0088) from September 1, 2014, to February 28, 2017.

## Jurisdiction

2. The Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491, which, _inter alia_, confers jurisdiction on the Court to render judgment upon any claim by or against, or dispute with, a contractor arising under the CDA. See 28 U.S.C. § 1491(a)(2); see also 41 U.S.C. § 7104(b)(1), (3).

## Parties

3. Pogo is a California corporation with its principal place of business in San Diego, California. Pogo provides personnel-staffing services, including truck and bus drivers, to government and commercial customers.

4. The Marine Corps is an armed force of the United States and a component of the Department of the Navy within the Department of Defense. See 10 U.S.C. §§ 101(a)(4), 111(b)(7), 5061(3)-(4), 5063.

## Facts

### Issuance of solicitation

5. On April 30, 2014, MCB Camp Pendleton issued Request for Quotations No. M00681-14-T-0009 with a response date of May 19, 2014 (later extended to June 2, 2014). The

solicitation was issued as a small business set-aside, and quoters were required to submit quotations under their General Services Administration ("GSA") LOGWORLD multiple-award schedule contracts under Federal Supply Classification Group 874, Part V. (This schedule is now part of the Professional Services (00CORP) multiple-award schedule.)

6. The solicitation contemplated the award of a task order under the selected awardee's schedule contract, with the task order being awarded on a labor-hour basis. The solicitation requested quotations to support the Southwest Region Fleet Transportation Department ("SWRFT") at MCB Camp Pendleton. Specifically, the solicitation required the selected contractor to provide commercial vehicle transportation management services – primarily, commercial truck and bus drivers – for seven Marine Corps installations in Arizona and California, including MCB Camp Pendleton.[1] The solicitation contemplated a one-year base period (September 1, 2014, to August 31, 2015) with four one-year options and a six-month option to extend. The task order was to be incrementally funded.

---

[1] In this Complaint, and depending on the context, the term "MCB Camp Pendleton" is used either (1) to describe the Regional Contracting Office (Marine Corps Installations West) at MCB Camp Pendleton – the organization issuing the solicitation and resulting task order at issue in this case – or (2) as a generic term to encompass all seven Marine Corps installations, including MCB Camp Pendleton.

7.    The solicitation included the Availability of
Funds (APR 1984) clause (Federal Acquisition Regulation ("FAR")
§ 52.232-18), the Availability of Funds for the Next Fiscal Year
(APR 1984) clause (FAR § 52.232-19), and the Requests for
Equitable Adjustment (DEC 2012) clause (Defense Federal
Acquisition Regulation Supplement ("DFARS") § 252.243-7002).
Pogo's resulting task order also included these clauses.  The
task order also included the Limitation of Government's
Obligation (APR 2014) clause (DFARS § 252.232-7007), but the
solicitation did not include this clause.

8.    The solicitation and resulting task order also
included the Payments under Time and Materials and Labor Hour
Contracts (AUG 2012) clause (FAR § 52.232-7).  Under paragraph
(d) of the clause, Pogo "agree[d] to use its best efforts to
perform the work specified in the Schedule and all obligations
under [the] contract within [the] ceiling price."  Pogo thus
furnished consideration to make its promises enforceable.

9.    The solicitation and resulting task order further
included the Disputes (JUL 2002) clause (FAR § 52.233-1), which
was incorporated by reference under the Contract Terms and
Conditions – Commercial Items (SEP 2013) clause (FAR § 52.212-
4).

4

10.     Pursuant to section 1.3 of the Performance Work Statement ("PWS") in the solicitation and resulting task order, the selected contractor was to furnish "<u>all</u> qualified personnel, supervision, and related services necessary to operate Government-owned/leased tractor-trailers, buses and light vehicles for transporting [Marine Corps] property and personnel throughout California and Arizona."  Emphasis added.

11.     Pursuant to section 3.6 of the PWS in the solicitation and resulting task order, the selected contractor was to provide Class A, Class B, and Class C drivers "in the locations required and at the estimated quantities specified in the schedule."  The solicitation and resulting task order required the contractor to provide Class A, Class B, and Class C drivers to four defined areas (Area I, Area II, Area III, and Area IV), and drivers were to be billed at regular and overtime rates.

12.     Under the Order Limitations (OCT 1995) (DEVIATION II – FEB 2007) clause (FAR § 52.216-19) in Pogo's LOGWORLD schedule contract, Pogo was obligated to accept any task order for a single item up to $1 million.  At its discretion, Pogo could accept larger orders.

13.     The solicitation and resulting task order did not provide for any minimum purchase requirement.

14. The solicitation and resulting task order were silent as to whether MCB Camp Pendleton had any capability to provide truck and bus drivers in-house. In particular, the solicitation and resulting task order did not mention that MCB Camp Pendleton also used civil-service drivers ("blue shirts") to handle runs.

## Estimates of driver usage in solicitation

15. The solicitation provided quoters with estimates of driver usage based on both (1) the <u>average number of drivers per day</u> for both normal day-to-day operations and surge volume and (2) the <u>estimated number of driver hours per year</u>.

16. Under section 4.6.2 of the PWS – and with respect to the average number of drivers per day for normal day-to-day operations – MCB Camp Pendleton estimated that it would require **91 drivers per day** (25 Class A, 53 Class B, and 13 Class C) to cover all seven Marine Corps installations. When surge requirements are added, those numbers increased by **102 drivers per day** (28 Class A, 64 Class B, and 10 Class C). Assuming 91 drivers working eight hours per day five days a week (40 hours per week), these figures equated to 189,280 hours per year [91 X 40 X 52] for normal operations. Put another way, these figures equated to **3,640 hours per week** [189,280 ÷ 52], and 520 hours per day [3,640 ÷ 7] (728 hours per day from Monday to Friday).

17.  The above estimate – which was also included in
the resulting task order - was roughly in line with the estimate
in the August 27, 2010, solicitation for the predecessor
contract of **3,160 hours per week** based on the number of required
drivers.  Section F.3 of that solicitation - MCB Camp Pendleton
Request for Proposals No. M00681-10-R-0022 - estimated a daily
requirement for 23 Class A, 45 Class B, and eleven Class C
drivers (79 drivers in total) for normal day-to-day operations.

18.  With respect to the estimated number of driver
hours per year, the Schedule of Supplies and Services in the
solicitation provided estimated yearly hours by Contract Line
Item Number (CLIN) for Class A, Class B, and Class C drivers.
The solicitation provided hours for both regular time and
overtime.  The total hours for the base year and each of the
four option years were 115,436.  Computed on a weekly basis,
that figure equated to **2,219.9 hours per week** [115,436 ÷ 52].
These figures were replicated in Tables 1.2(A) and 1.2(B) in the
PWS.  The Schedule of Supplies and Services and Tables 1.2(A)
and 1.2(B) were also included in the resulting task order.

19.  There was a large discrepancy in the solicitation
between (1) the estimated hours per week based on the average
number of drivers per day for normal day-to-day operations in
section 4.6.2 of the PWS (3,640 hours per week) and (2) the
estimated hours per week based on the estimated number of driver

7

hours per year in the Schedule of Supplies and Services and in Tables 1.2(A) and 1.2(B) in the PWS (2,219.9 hours per week). By itself, this large discrepancy demonstrates that MCB Camp Pendleton was negligent in preparing these estimates and disseminating them to quoters.

20. BryMak & Associates, Inc. ("BryMak"), was the predecessor contractor from 2006 to 2014. Upon information and belief, MCB Camp Pendleton extended BryMak's contract for six months from March 1, 2014, to August 31, 2014, so that MCB Camp Pendleton would have additional time to issue its solicitation and evaluate quotations. Notwithstanding such extra time, and despite precipitously declining driver requirements in 2013 and 2014 [see paragraphs 26-31 infra], MCB Camp Pendleton still issued a solicitation calling for more drivers per day for normal day-to-day operations (91) than its 2010 solicitation had called for (79).

21. Upon information and belief, MCB Camp Pendleton developed its estimates of driver and driver-hour usage in the 2014 solicitation by "worst-casing" its expected requirements. In particular, and at the request of the MCB Camp Pendleton Regional Contracting Office, a SWRFT representative canvassed the site managers at the seven Marine Corps installations to be covered by the task order, who provided very high estimates of anticipated driver usage. For example, the Marine Corps offers

a seven-week Weapons and Tactics Instructor course at MCAS Yuma twice a year (fourteen weeks in total).  In developing a driver estimate for MCAS Yuma, the MCAS Yuma site manager estimated how many drivers would be necessary per day to support that evolution and requested that number of drivers <u>for the entire year</u>.  Thus, per the driver estimates in the solicitation, Pogo ultimately had to plan for that high number of drivers even though, for 38 weeks, many of those drivers would not be needed.

### Award of task order to Pogo

22.  Between May 13, 2014, and May 28, 2014, MCB Camp Pendleton issued three amendments to Request for Quotations No. M00681-14-T-0009.  Two of the amendments – Amendment Nos. 1 and 2 – contained revised PWS's.  There were no changes in the driver and driver-hour estimates.

23.  On or about June 2, 2014, Pogo submitted a timely quotation in response to Request for Quotations No. M00681-14-T-0009.  In preparing its proposed pricing, Pogo relied on the estimates of driver usage in the solicitation; <u>i.e.</u>, the average number of drivers per day for both normal day-to-day operations and surge volume and the estimated number of driver hours per year.

24.  On July 23, 2014, MCB Camp Pendleton issued Amendment No. 4 – its final amendment – to the solicitation

requiring quoters to resubmit their price quotations "in their entirety."[2]  Again, MCB Camp Pendleton did not change the estimates in the solicitation.  Quoters were given until July 28, 2014, to resubmit their pricing, which Pogo did.

25.  On August 21, 2014 – and after further evaluation of quotations - MCB Camp Pendleton issued Task Order No. M00681-14-F—0088 to Pogo under its LOGWORLD multiple-award schedule contract (Contract No. GS-10F-091BA).  The task order had an effective date of September 1, 2014.  The estimated contract amount for the base year was $3,632,433.81, and the total contract value (base year, four one-year options, and the six-month option to extend) was $19,995,344.  Initially, funds were not available for performance past December 1, 2014, and the task order was incrementally funded ($907,849.90) through November 30, 2014.

**Actual driver usage drops precipitously prior to issuance of solicitation and award of resulting task order, falling far short of estimates in solicitation and task order**

26.  According to Pogo's onsite manager – who had also been the onsite manager for BryMak, the predecessor contractor

---

[2]    MCB Camp Pendleton issued the amendment to clarify that Class B drivers are passenger bus drivers as opposed to drivers of box-vans with air brakes.

from 2006 to 2014 – MCB Camp Pendleton's driver requirements dropped precipitously from January to August 2014, a period encompassing the four months prior to the issuance of Request for Quotations No. M00681-14-T-0009 on April 30, 2014, and the nearly four months from May 1, 2014, to the award of Task Order No. M00681-14-F-0088 to Pogo on August 21, 2014. Pogo's onsite manager described this drop in requirements as a "huge change." This drop in requirements continued a trend that had begun in early 2013.

27.   For the eight-month period from January 1 to August 31, 2014, BryMak's contract volume was only **$585,000 for the entire eight months.**   This averaged to about $18,280 per week [$585,000 ÷ 32].   At BryMak's rate of $43 per hour – significantly higher than Pogo's rate under its follow-on task order – BryMak was only averaging about **425 hours per week** [$18,280 ÷ 43] in contract volume.

28.   In 2014, BryMak's driver runs were off by approximately 75 percent from historical levels.

29.   The drop in driver requirements in 2013 and from January to August 2014 occurred largely as a result of troop drawdowns due to the contraction of military operations in Iraq and Afghanistan.   In this regard, from 2013 to date, the Marine Corps' force level has decreased by about 20,000 soldiers

nationwide.  Sequestration, which began in March 2013 — and the government shutdown in the fall of 2013 — also significantly reduced driver requirements.  In particular, as a result of the budget cuts resulting from sequestration, the Marine Corps moved many of its training sites from offbase to onbase, reducing the need for drivers.  Finally, MCB Camp Pendleton's increased "funneling" of work to the civil-service drivers ("blue shirts") following sequestration [see paragraph 30 infra] also greatly reduced driver requirements.

30.  As noted, both prior to and after award of Task Order No. M00681-14-F-0088 to Pogo, MCB Camp Pendleton also used "blue shirts" to handle runs.  In the months following sequestration, which began in March 2013, and running up to September 2014 when Pogo commenced performance under its task order, the manager of the "blue shirts" (i.e., the civil-service driver supervisor) — responding to union pressure amid the declining need for drivers — assumed control of the driver run sheets for the first time in at least fifteen years, taking such control away from the SWRFT.  The manager used his authority to manipulate the run sheets to favor the "blue shirts" over first, BryMak's drivers and, later, Pogo's drivers.  For example, in an effort to deprive BryMak's drivers (and, later, Pogo's drivers) of runs, the manager manipulated the run sheets so as to provide

overtime to the "blue shirts" at the expense of the contract drivers.

31. MCB Camp Pendleton and Pogo entered into task order performance under a mutual mistake of fact that the driver and driver-hour estimates in the solicitation (and incorporated into Pogo's task order) were based on and accurately reflected recent actual historical data, and Pogo relied on MCB Camp Pendleton's estimates of driver and driver-hour usage in the solicitation in pricing its 2014 quotation. Pogo was not responsible for the grossly inaccurate driver and driver-hour estimates, which caused Pogo to suffer damages. In addition, both Pogo – and apparently MCB Camp Pendleton – were unaware that the manager of the "blue shirts" was manipulating the run sheets to favor the "blue shirts" over BryMak's drivers, further degrading the accuracy of the solicitation estimates. See paragraphs 54-55 infra.

**Actual driver usage during task order performance falls far short of estimates in solicitation and task order**

32. Pogo began contract performance on September 1, 2014. Almost immediately, Pogo realized that actual driver usage was dramatically lower than the estimates that MCB Camp Pendleton had provided in Request for Quotations No. M00681-14-T-0009. Pogo's contract volume remained very low for the first

year of the task order, which ended on August 31, 2015. During this period, Pogo averaged only 1,150.97 driver hours per week from September 1 to December 31, 2014, and 1,281.72 hours per week from January 1 to August 31, 2015.

33. On June 8, 2015, and per Modification No. P00007 to Pogo's task order, MCB Camp Pendleton exercised its option for Option Year 1 (September 1, 2015, to August 31, 2016).

34. On October 6, 2015, MCB Camp Pendleton's transportation manager admitted in an internal e-mail that "[i]t's obviously hard [for Pogo] to keep drivers at the ready when there is no work."

35. In October and November 2015, there was an unexpected – and uncharacteristic – surge in requirements from MCB Camp Pendleton. On or about January 28, 2016, Pogo submitted a request for an equitable adjustment ("REA") for $189,891.33 to MCB Camp Pendleton, which the Marine Corps paid per Modification No. P00016 to Pogo's task order.

36. Modification No. P00016 had an effective date of February 10, 2016. Besides the REA, the modification also included a revised PWS that left the estimates of driver usage in section 4.6.2 (estimated average number of drivers per day) and Tables 1.2(A) and 1.2(B) (estimated number of driver hours per year) unchanged.

37. On July 19, 2016, MCB Camp Pendleton notified Pogo of the Marine Corps' intent to exercise its option for Option Year 2 (September 1, 2016, to August 31, 2017). On August 22, 2016, however, MCB Camp Pendleton reversed course, advising Pogo of the Marine Corps' intent to not exercise its option for Option Year 2. MCB Camp Pendleton advised Pogo that, "[d]ue to fiscal constraints, the government does not have the full funding available to exercise the follow-on option year, or the budget to fully fund any of the subsequent option years." Instead, pursuant to the Option to Extend Services (NOV 1999) clause (FAR § 52.217-8), MCB Camp Pendleton notified Pogo that the Marine Corps would extend the contract for an additional six months from September 1, 2016, to February 28, 2017, "while a new contract with additional funding flexibility is contemplated."

38. Pogo's contract volume remained low through the end of Option Year 1, which expired on August 31, 2016. During this period, Pogo averaged only 1,281.72 driver hours per week from September 1 to December 31, 2015, and 1,260.97 hours per week from January 1 to August 31, 2016.

39. On August 31, 2016, and per Modification P00018 to Pogo's task order, MCB Camp Pendleton extended Pogo's task order for an additional six months through February 28, 2017.

40. Driver usage continued to drop throughout the term of the task order until December 2016, when driver usage virtually vanished.

41. In or about December 2016, the Military Expeditionary Force (MEF) at MCB Camp Pendleton began sending its driver requirements to the Traffic Management Office ("TMO") at Scott Air Force Base in Illinois to fulfill driver requirements utilizing other contractors. This diversion of requirements virtually eliminated Pogo's contract volume for the final months of its task order. The diversion was largely caused by a dispute between the union for the "blue-shirt" drivers and the SWRFT over overtime for the "blue-shirt" drivers, resulting in the SWRFT "punishing" the union (and, collaterally, Pogo) by diverting its requirements to the TMO.

42. Pogo's task order expired on February 28, 2017. During the six-month extension of Pogo's task order, Pogo averaged only 1,260.97 driver hours per week from September 1 to December 31, 2016, and 522.18 hours per week from January 1 to February 28, 2016.

43. As noted, Pogo's task order (which did not provide for any minimum purchase requirement) was incrementally funded. Had MCB Camp Pendleton met its annual hours estimates for driver usage – the lower of the two estimates – the total

contract value would have been about **$9,083,042** [$3,632,434
(base year) + $3,633,409 (Option Year 1) + $1,817,199
($3,634,398 ÷ 2) (Option Year 2)].  Through February 27, 2017,
however – and per Modification No. P00022 to Pogo's task order –
the total contract value (contract ceiling) was only
$5,267,348.39, a $3,815,693.61 decrease from the solicitation
estimates.[3]  Worse, MCB Camp Pendleton only ordered (and paid
for) driver services worth **$4,432,565** from Pogo, a $4,650,477
decrease from the solicitation estimates.

    44.  For most of the term of Pogo's task order
(September 1, 2014, to February 28, 2017), weekly driver usage
did not exceed 1,300 hours.[4]  Indeed, in the final months of the
task order, weekly driver usage averaged only about 500 hours.
These figures are far less than the weekly hours that Pogo
expected based on the solicitation estimates for the average
number of drivers per day for normal day-to-day operations
(3,640 hours per week), much less the anticipated surge volume.
These figures are also significantly less than the estimated

---

[3]    The expected contract value would be higher if calculated
based on the estimated average number of drivers per day.  By
definition, therefore, the decrease from the solicitation
estimates would also be higher, exceeding $3,815,693.61.

[4]    As noted, the one exception occurred in October and
November 2015, when there was an unexpected surge in
requirements from MCB Camp Pendleton.

number of weekly hours that Pogo expected based on the annual volume figures in the Schedule of Supplies and Services and in Tables 1.2(A) and 1.2(B) in the PWS (2,219.9 hours per week).

45.  Pogo has attached a chart showing its driver hours for each week during the entire term of its task order [see Exhibit 1] as well as a chart showing the number of drivers per week ("headcount") for the same period. See Exhibit 2. Pogo has also attached a chart showing its average weekly driver hours for each year of the task order. See Exhibit 3. Exhibit 3 shows that Pogo's average weekly driver hours for 2014, 2015, 2016, and 2017 were only 1,150.97 (2014), 1,281.72 (2015), 1,260.97 (2016), and 522.18 (2017), respectively.

46.  During the term of Pogo's task order, Pogo's onsite manager complained on a near-daily basis to MCB Camp Pendleton representatives about the low driver volume, asking how Pogo was supposed to keep its task order "alive." Pogo's onsite manager would complain, for example, that MCB Camp Pendleton would schedule Pogo for four or five runs, but Pogo's drivers would show up and then be told that they were not needed. On one occasion, the government transportation coordinator at MCB Camp Pendleton laughed off the onsite manager's complaint, saying that Pogo should have other work and noting that "when Pogo was here before" [as a previous

contractor for some years prior to 2006], Pogo's drivers would be "moving something from the county dump." On other occasions, MCB Camp Pendleton representatives commented that there wasn't enough work to "justify keeping all 33 [GSA-owned] buses on the base" and that the Marine Corps – which was leasing the buses from the GSA – "[couldn't] afford them all."

47. Notwithstanding MCB Camp Pendleton's lack of need for drivers and the resultant low driver hours for Pogo, MCB Camp Pendleton refused to provide any relief to Pogo with respect to the contract requirement that Pogo maintain an inventory of 91 drivers per day when – on most days – far fewer drivers would have been sufficient to meet the Marine Corps' requirements. Because of the low contract usage, Pogo incurred massive expenses in connection with the constant "churn" of drivers who were either underutilized or not used at all. These expenses included recruiter payroll costs, recruiting advertising costs, RAPIDGate (base access) costs, drug-screening costs, training costs, and apparel costs.

48. Because MCB Camp Pendleton was so erratic in its contract usage, Pogo's roster of drivers was a "revolving door." Indeed, the situation was so bad that drivers routinely ignored Pogo's recruiting messages, not trusting that they would even be used. Put another way, Pogo was forced to maintain a "million-

dollar roster" of 91 drivers who – for the most part – were not used.

49.  The "churn" in Pogo's drivers was so great that Pogo had to recruit 420 drivers during the 30-month term of the task order (September 1, 2014, to February 28, 2017).  See Exhibit 4.  Not all of these drivers actually worked for Pogo, but Pogo had to recruit all of them in order to maintain the required staffing levels.  Incredibly, Pogo cycled through 230 drivers in the last six months of the task order (September 1, 2016, to February 28, 2017).

50.  MCB Camp Pendleton's refusal to provide relief to Pogo with respect to the contract requirement that Pogo maintain an inventory of 91 drivers rendered the task order unconscionable or, at the very least, commercially impracticable to perform.

51.  As an illustration of MCB Camp Pendleton's unreasonableness, MCB Camp Pendleton issued a cure notice to Pogo on October 20, 2016, stating that Pogo's "inability to supply the required number of drivers (57)" was endangering task order performance.[5]  Pogo was directed to submit an action plan within ten days, which Pogo did.  Pogo's offense?  It failed to provide three drivers for two consecutive days.  Perhaps not

_____

[5]  The "57" figure related only to the surge requirements for MCB Camp Pendleton, MCAS Miramar, and MCRD San Diego.

surprisingly, MCB Camp Pendleton did not issue a Contract
Deficiency Report (CDR) to Pogo.

52. On October 27, 2016, MCB Camp Pendleton issued an
interim Contractor Performance Assessment Report (CPAR) for Pogo
covering the period from September 1, 2015, to August 31, 2016
(Option Year 2), a period just prior to the events precipitating
the cure notice. While rating Pogo "satisfactory" in quality,
schedule, and cost control, the contracting officer's technical
representative (COTR) noted that "Pogo has had some failure
meeting the requirement of SURGE and has not covered the excess
driver requirements." Thus, MCB Camp Pendleton put Pogo on
notice – as it had repeatedly done before - that the Marine
Corps would scrupulously "hold Pogo's feet to the fire" with
respect to being constantly able to supply the maximum number of
required drivers on any given day notwithstanding MCB Camp
Pendleton's infrequent need for such a high number of drivers.
Also, MCB Camp Pendleton made it manifestly clear to Pogo that
MCB Camp Pendleton would not hesitate to issue a cure notice, a
negative performance evaluation, and/or a default termination if
Pogo – even if by just a driver or two – failed to provide the
maximum required number of drivers on the rare day when the
Marine Corps' usage actually necessitated such a high number of
drivers.

53.    Upon information and belief, MCB Camp Pendleton did not procure driver services from any other contractor besides Pogo during the term of Pogo's task order.  MCB Camp Pendleton did, however, utilize the civil-service "blue shirts" on runs and – late in the term of Pogo's task order – diverted driver requirements to the TMO at Scott Air Force Base in Illinois to fulfill driver requirements utilizing other contractors.

## MCB Camp Pendleton manipulates run sheets to favor civil-service drivers ("blue shirts")

54.    As noted, MCB Camp Pendleton's solicitation and resulting task order were silent as to whether MCB Camp Pendleton had any capability to provide truck and bus drivers in-house.  In particular, the solicitation and resulting task order did not mention that MCB Camp Pendleton also used civil-service drivers ("blue shirts") to handle runs – a practice that continued after the award of the task order to Pogo.

55.    In the months following sequestration, which began in March 2013, and running up to September 2014 when Pogo commenced performance under its task order, the manager of the "blue shirts" (i.e., the civil-service driver supervisor) – responding to union pressure amid the declining need for drivers – assumed control of the driver run sheets for the first time in at least fifteen years, taking such control away from the SWRFT.

The manager used his authority to manipulate the run sheets to favor the "blue shirts" over first, BryMak's drivers and, later, Pogo's drivers. For example, in an effort to deprive BryMak's drivers (and, later, Pogo's drivers) of runs, the manager manipulated the run sheets so as to provide overtime to the "blue shirts" at the expense of the contract drivers.

## MCB Camp Pendleton hinders Pogo's performance

56. On two occasions in September 2016, MCAS Yuma[6] representatives advised newly hired Pogo drivers that they could only expect to get one days' work and then "nothing else" for two to three weeks and that they were "wasting [their] time" waiting for work that was never going to materialize. The Yuma representatives also advised the new hires that the representatives had no idea why Pogo had hired them. On the first occasion, Pogo lost three drivers because of such comments. As a result of these comments, Pogo was forced to create a form for its drivers informing them that the driver requirements at MCAS Yuma would be sporadic.

57. MCB Camp Pendleton frequently ordered drivers for runs but would cancel an order at the last minute, costing Pogo good will with its drivers and also running up unnecessary expenses. In one such instance, MCAS Yuma repeatedly ordered

---

[6]    MCAS Yuma was one of the seven Marine Corps installations supported by Pogo.

drivers for its multi-week Weapons and Tactics Instructor course but abruptly canceled orders for several days of training.

### Nature of task order

58.  Notwithstanding that Task Order No. M00681-14-F-0088 was styled as a labor-hour contract, MCB Camp Pendleton treated the task order as a requirements contract, and the task order had the "look and feel" of a requirements contract.  Under the task order, MCB Camp Pendleton required Pogo to maintain a "million-dollar roster" of drivers, a firm deliverable.  By including categorical requirements for drivers required for normal day-to-day and surge operations (deliverables) in the solicitation and resulting task order – and forcing Pogo to scrupulously adhere to those requirements – MCB Camp Pendleton in effect converted what might have otherwise been a labor-hour contract to a requirements contract.

59.  As noted, in October and November 2015, there was an unexpected surge in requirements from MCB Camp Pendleton.  On or about January 28, 2016, Pogo submitted an REA for $189,891.33 to MCB Camp Pendleton, which the Marine Corps paid per Modification No. P00016 to Pogo's task order.  The Marine Corps' payment of this REA evidences that MCB Camp Pendleton viewed Pogo's task order as a requirements contract rather than a labor-hour contract; i.e., a contract that permitted MCB Camp Pendleton to order any driver requirements that it needed as a

24

result of an "unexpected surge" rather than limiting orders to a contract ceiling and possibly being unable to respond to such a surge.

### Pogo's certified claim

60. On April 9, 2018, Pogo submitted a certified claim for $761,214.74 to the MCB Camp Pendleton contracting officer pursuant to the CDA. The claim represented costs that Pogo incurred in providing drivers under the task order from September 1, 2014, to February 28, 2017. Pogo requested that the contracting officer issue a final decision under the CDA with respect to its claim.

61. On May 31, 2018, the contracting officer denied Pogo's claim in its entirety. See Exhibit 5. The contracting officer opined, inter alia, that Pogo had based its claim on "erroneous assumptions not founded on the terms and conditions of the solicitation and/or task order." The contracting officer conceded, however, that "POGO had a contract to provide driver support up to the maximum number of drivers in the estimate", a concession diametrically at odds with the notion that the task order was a labor-hour contract.[7]

_____

[7] Pogo previously submitted a less expansive certified claim for $761,214.74 to the contracting officer on March 31, 2017, which the contracting officer denied in its entirety on June 14, 2017. Pogo filed suit at the United States Court of Federal Claims ("COFC") on October 12, 2017 (Case No. 17-1503C) but - following the filing of the Government's motion to dismiss or,

### Pogo's damages

62.   MCB Camp Pendleton negligently prepared its
estimates of driver and driver-hour usage, (2) breached its
warranty of the reasonable accuracy of such estimates, (3)
tortiously breached the task order by negligently
misrepresenting that the estimates were based on and accurately
reflected recent actual historical data, (4) failed to disclose
its superior knowledge that, inter alia, its driver requirements
had dropped precipitously from early 2013 through August 2014,
(5) unconscionably refused to provide relief to Pogo with
respect to the contract requirement that Pogo maintain an
inventory of 91 drivers per day throughout the term of the task
order, (6) diverted its driver requirements to the TMO, (7)
breached the Government's implied covenant of good faith and
fair dealing by failing to update its driver estimates during
task order performance (breach of duty to cooperate), and (8)
breached the Government's implied covenant of good faith and
fair dealing by hindering Pogo's performance (breach of duty not
to hinder Pogo's performance).   Alternatively, MCB Camp
Pendleton and Pogo (9) entered into task order performance under
a mutual mistake of fact that the driver and driver-hour
estimates in the solicitation were based on and accurately

---

in the alternative, for partial dismissal – voluntarily
dismissed its complaint on January 16, 2018.

reflected recent actual historical data.  These actions, separately and in the aggregate, caused substantial monetary damage to Pogo.

63.  Pogo is entitled to lost profits on the orders that it would have received had the estimated contract volume materialized and there had been less "churn" of drivers who were either underutilized or not used at all.  The lost contract volume from September 1, 2014, to February 28, 2017, computed on the basis of expected weekly driver hours based on MCB Camp Pendleton's annual hours estimates – the lesser of the two estimates (driver and driver-hour) in the solicitation and resulting task order – was $4,650,477 [$9,083,042 – $4,432,565]. Given Pogo's average profit margin of twelve percent, Pogo's lost profits amount to **$558,057.24** [$4,650,477 X .12].

64.  Pogo incurred recruiter payroll costs of $150,000 during the task order performance period.  Pogo expended these costs to hire one full-time recruiter ($75,000) and two part-time recruiters ($75,000).  Pogo would not have had to hire the part-time recruiters if MCB Camp Pendleton's estimated contract volume had materialized and there had been less "churn" of drivers who were either underutilized or not used at all. Accordingly, Pogo claims **$75,000** in additional recruiter payroll costs.

65. Pogo incurred recruiting advertising costs of $75,000 during the task order performance period ($2,500 per month for 30 months). Pogo believes that only twenty percent of these costs ($15,000 for six months of advertising) would have been necessary if MCB Camp Pendleton's estimated contract volume had materialized and there had been less "churn" of drivers who were either underutilized or not used at all. Accordingly, Pogo claims **$60,000** in additional recruiting advertising costs.

66. Pogo incurred RAPIDGate (base access) costs of $53,707 during the task order performance period. Pogo believes that about two-thirds of these costs ($33,307) would have been unnecessary if MCB Camp Pendleton's estimated contract volume had materialized and there had been less "churn" of drivers who were either underutilized or not used at all. Put another way, Pogo believes that its RAPIDGate costs should only have been $20,400. Accordingly, Pogo claims **$33,307** in additional RAPIDGate costs.

67. Pogo incurred drug-screening costs of $13,519 during the task order performance period. Pogo believes that about two-thirds of these costs ($9,031) would have been unnecessary if MCB Camp Pendleton's estimated contract volume had materialized and there had been less "churn" of drivers who were either underutilized or not used at all. Put another way, Pogo believes that its drug-screening costs should only have

been $4,488.  Accordingly, Pogo claims **$9,031** in additional drug-screening costs.

68.  Pogo incurred training costs of $10,000 during the task order performance period.  Pogo believes that about 70 percent of these costs ($6,940) would have been unnecessary if MCB Camp Pendleton's estimated contract volume had materialized and there had been less "churn" of drivers who were either underutilized or not used at all.  Put another way, Pogo believes that its training costs should only have been $3,060. Accordingly, Pogo claims **$6,940** in additional training costs.

69.  Pogo incurred apparel costs (tee shirts) of $26,223.50 during the task order performance period.[8]  Pogo believes that about 70 percent of these costs ($18,879.50) would have been unnecessary if MCB Camp Pendleton's estimated contract volume had materialized and there had been less "churn" of drivers who were either underutilized or not used at all.  Put another way, Pogo believes that its apparel costs should only have been $7,344.  Accordingly, Pogo claims **$18,879.50** in additional apparel costs.

---

[8]    Section I.d of the Base Access Requirements section of the task order required contractor personnel to "be readily identifiable as an employee of the contractor either through the use of uniforms or with nametags, as directed by the Contracting Officer."  In addition, section 3.3 of the PWS required all contractor personnel to be outfitted with "a conservatively styled standard uniform shirt [with] the individual[']s name and company name displayed over the breast pockets."

70.  Pogo maintains that its task order should properly be characterized as a requirements contract – and not a labor-hour contract, despite the solicitation language.  See paragraphs 58-59 supra.  Nonetheless, Pogo has identified a number of cases where the COFC has awarded damages to a contractor on a negligent-estimate or similar theory where the contract in question was not styled as a requirements contract. See, e.g., Engineered Demolition, Inc. v. United States, 70 Fed. Cl. 580, 591-93 (2006) (Government can be liable for breach for providing negligent estimates on a non-requirements firm-fixed-price contract); Womack v. United States, 389 F.2d 793 (Ct. Cl. 1968) (Bureau of Land Management negligently prepared an estimate for the number of mounted aperture and cross-reference cards to be annotated under a non-requirements contract for modernizing land records for the State of Utah, entitling contractor to recover for the Government's inadvertent misrepresentation).  Accordingly, Pogo contends that it is entitled to damages for the Government's breach of contract regardless of whether the task order is characterized as a requirements contract and, indeed, even if the task order is characterized as a labor-hour contract, which Pogo rejects.

### Count 1

### (Negligently Prepared Government Estimates)

71.  Pogo incorporates by reference the allegations contained in paragraphs 1-70 supra.

72.  MCB Camp Pendleton was negligent in preparing its driver and driver-hour estimates in Request for Quotations No. M00681-14-T-0009, causing Pogo to suffer damages.  In particular, MCB Camp Pendleton failed to provide Pogo (and the other quoters) with the most current information available and failed to either reformulate its estimates or notify Pogo (and the other quoters) of situations or factors likely to affect the estimates.  Put another way, MCB Camp Pendleton's estimates were inadequately or negligently prepared, not in good faith, and grossly or unreasonably inadequate at the time the estimates were made.

73.  MCB Camp Pendleton failed to notify Pogo (and the other quoters) of dramatic troop drawdowns at the seven Marine Corps installations that were already occurring prior to and during the solicitation period.  Put another way, it should have been obvious to MCB Camp Pendleton that the estimates in Request for Quotations No. M00681-14-T-0009 were wholly unrealistic.

74.  MCB Camp Pendleton also failed to notify Pogo (and the other quoters) that - as a result of sequestration - the Marine Corps had moved many of its training sites from offbase to onbase, further reducing driver requirements.  In addition, MCB Camp Pendleton failed to notify Pogo (and the

other quoters) of the Marine Corps' increased "funneling" of work to the "blue shirts" that was occurring prior to and during the solicitation period. Finally, MCB Camp Pendleton also failed to notify Pogo (and the other quoters) that BryMak's driver runs in 2014 were off by approximately 75 percent from historical levels and that its contract volume was only $585,000 for the eight-month period from January 1 to August 31, 2014.

75. As noted in paragraph 19 supra, there was a large discrepancy in the solicitation between (1) the estimated hours per week based on the average number of drivers per day for normal day-to-day operations in section 4.6.2 of the PWS (3,640 hours per week) and (2) the estimated hours per week based on the estimated number of driver hours per year in the Schedule of Supplies and Services and in Tables 1.2(A) and 1.2(B) in the PWS (2,219.9 hours per week). Even before considering that both of these estimates greatly exceeded the actual driver usage during task order performance, the large discrepancy in these estimates alone demonstrates that MCB Camp Pendleton was negligent in preparing them and disseminating them to quoters.

76. MCB Camp Pendleton was also negligent in failing to update its driver estimates during the solicitation period in 2014 to reflect the precipitous drop in driver usage commencing in early 2013 and running at least to August 31, 2014, thus breaching Pogo's task order. MCB Camp Pendleton compounded this

error by failing to update its estimates during task order performance so that Pogo could request an equitable price adjustment.

77. Pogo relied on MCB Camp Pendleton's estimates of driver and driver-hour usage in the solicitation in pricing its 2014 quotation.

78. The driver and driver-hour estimates in the solicitation were incorporated into Pogo's task order.

79. Under established principles of government contracts law, a contractor can recover damages from the Government for increased costs it incurs in performing a contract under a negligent-estimate theory, which requires the contractor to show that the Government's estimates were "'inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made.'" Agility Def. & Gov't Servs., Inc. v. United States, 847 F.3d 1345, 1350 (Fed. Cir. 2017) (citing Medart, Inc. v. Austin, 967 F.2d 579, 581 (Fed. Cir. 1992)). Put another way, there is an implied obligation upon the Government to "act in good faith and use reasonable care in computing its estimated needs", and the Government's "[f]ailure to meet that obligation constitutes a breach of the resulting contract." Rumsfeld v. Applied Companies, Inc., 325 F.3d 1328, 1335 (Fed. Cir.), cert. denied, 540 U.S. 981 (2003) (citing Medart, 967 F.2d at 581).

80.    For the reasons set forth above, Pogo is entitled to $761,214.74 plus interest from March 31, 2017, to the date of payment (or an amount to be proved at trial) as damages for the Government's negligently prepared estimates of driver and driver-hour usage.

<h3 align="center">Count 2</h3>

<h3 align="center">(Breach of Warranty of Reasonable Accuracy of Government Estimates)</h3>

81.    Pogo incorporates by reference the allegations contained in paragraphs 1-70 supra.

82.    MCB Camp Pendleton warranted the reasonable accuracy of its estimates of driver and driver-hour usage in the solicitation.

83.    Pogo relied on MCB Camp Pendleton's estimates of driver and driver-hour usage in the solicitation in pricing its 2014 quotation.

84.    The driver and driver-hour estimates in the solicitation were incorporated into Pogo's task order.

85.    Pogo suffered damages as the reasonably foreseeable result of MCB Camp Pendleton's breach of warranty of the reasonable accuracy of its driver and driver-hour estimates.

86.    For the reasons set forth above, Pogo is entitled to $761,214.74 plus interest from March 31, 2017, to the date of payment (or an amount to be proved at trial) as damages for the

Government's breach of warranty of the reasonable accuracy of its estimates of driver and driver-hour usage.

**Count 3**

**(Tortious Breach of Contract/Negligent Misrepresentation)**

87.  Pogo incorporates by reference the allegations contained in paragraphs 1-70 <u>supra</u>.

88.  Pogo had a right to assume that the driver and driver-hour estimates in MCB Camp Pendleton's solicitation were based on and accurately reflected recent actual historical data.

89.  The large discrepancy in the solicitation and task order between (1) the estimated hours per week based on the average number of drivers per day for normal day-to-day operations in section 4.6.2 of the PWS (3,640 hours per week) and (2) the estimated hours per week based on the estimated number of driver hours per year in the Schedule of Supplies and Services and in Tables 1.2(A) and 1.2(B) in the PWS (2,219.9 hours per week) demonstrates that one or the other or, more likely, both of these estimates were not based on and did not accurately reflect recent historical data.

90.  Pogo relied on MCB Camp Pendleton's estimates of driver and driver-hour usage in the solicitation in pricing its 2014 quotation.

91.  The driver and driver-hour estimates in the solicitation were incorporated into Pogo's task order.

35

92.  MCB Camp Pendleton's failure to ensure that its driver and driver-hour estimates were based on and accurately reflected recent actual historical data constituted a negligent misrepresentation that resulted in a tortious breach of the task order, causing Pogo to suffer damages.  See Rumsfeld v. Applied Companies, Inc., 325 F.3d 1328, 1335 (Fed. Cir.), cert. denied, 540 U.S. 981 (2003) ("[T]o the extent that a government estimate is inadequately or negligently prepared, its inclusion without correction in a solicitation or contract constitutes a misrepresentation that, whether deliberate or unintentional, amounts to a breach of contract.").

93.  For the reasons set forth above, Pogo is entitled to $761,214.74 plus interest from March 31, 2017, to the date of payment (or an amount to be proved at trial) as damages for the Government's negligent misrepresentation of its driver and driver-hour usage.

## Count 4

### (Failure to Disclose Superior Knowledge)

94.  Pogo incorporates by reference the allegations contained in paragraphs 1-70 supra.

95.  MCB Camp Pendleton was aware that its driver requirements had dropped precipitously from early 2013 through August 2014, a period encompassing over a year prior to the issuance of Request for Quotations No. M00681-14-T-0009 on April

30, 2014, and the nearly four months from May 1, 2014, to the award of Task Order No. M00681-14-F—0088 to Pogo on August 21, 2014. MCB Camp Pendleton was also aware that BryMak's (the predecessor contractor's) contract volume was only $585,000 for the eight-month period from January 1 to August 31, 2014, and that its driver runs in 2014 were off by approximately 75 percent from historical levels. MCB Camp Pendleton nonetheless failed to disclose this information to Pogo (and the other quoters).

96. MCB Camp Pendleton also failed to notify Pogo (and the other quoters) of the Marine Corps' increased "funneling" of work to the "blue shirts" that was occurring prior to and during the solicitation period as well as its shift from offbase to onbase training.

97. The doctrine of superior knowledge applies to situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects its performance costs or duration, (2) the Government was aware that the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the Government failed to provide the relevant information. Hercules, Inc. v. United States, 24 F.3d 188, 196 (Fed. Cir. 1994), aff'd, 516 U.S. 417 (1996).

98. MCB Camp Pendleton's failure to disclose the precipitous drop in its driver requirements from early 2013 to August 2014 – and other nondisclosures described above, all of which caused Pogo to suffer damages – induced Pogo to undertake performance of the task order without vital knowledge of facts that would have affected its performance costs, implicating the doctrine of superior knowledge.

99. For the reasons set forth above, Pogo is entitled to $761,214.74 plus interest from March 31, 2017, to the date of payment (or an amount to be proved at trial) as damages for MCB Camp Pendleton's failure to disclose its superior knowledge that, inter alia, its driver requirements had dropped precipitously from early 2013 to August 2014.

### Count 5

### (Unconscionability and Commercial Impracticability)

100. Pogo incorporates by reference the allegations contained in paragraphs 1-70 supra.

101. Notwithstanding MCB Camp Pendleton's lack of need for drivers and the resultant low driver hours for Pogo, MCB Camp Pendleton refused to provide any relief to Pogo with respect to the contract requirement that Pogo maintain an inventory of 91 drivers per day throughout the term of the task order when – on most days – far fewer drivers would have been sufficient to meet the Marine Corps' requirements.

102. MCB Camp Pendleton's refusal to provide relief to Pogo from the onerous contract requirement to maintain an inventory of drivers far in excess of actual government requirements rendered the task order unconscionable or, at the very least, commercially impracticable to perform, causing Pogo to suffer damages. MCB Camp Pendleton's refusal to provide relief from such impracticability of performance constituted a constructive change to Pogo's task order entitling Pogo to an equitable adjustment for the costs that it incurred in performing the task order. See John Cibinic, Jr., Ralph C. Nash, Jr., and James F. Nagle, Administration of Government Contracts at 442 (4th ed. 2006) ("[I]n the government contracts field there exists a line of cases in which impracticability has been characterized as a constructive change with the result that the contractor obtains an equitable adjustment compensating for the costs incurred in attempting to perform. In effect, a defense for nonperformance [is] converted into an affirmative claim for compensation.").

103. For the reasons set forth above, Pogo is entitled to $761,214.74 plus interest from March 31, 2017, to the date of payment (or an amount to be proved at trial) as damages for MCB Camp Pendleton's conduct rendering the task order unconscionable, or, at the very least, commercially impracticable to perform.

## Count 6

## (Diversion of Requirements)

104. Pogo incorporates by reference the allegations contained in paragraphs 1-70 supra.

105. In or about December 2016, the Military Expeditionary Force (MEF) at MCB Camp Pendleton began sending its driver requirements to the TMO at Scott Air Force Base in Illinois to fulfill driver requirements utilizing other contractors. This diversion of requirements virtually eliminated Pogo's contract volume for the final months of its task order.

106. MCB Camp Pendleton's diversion of requirements constituted a breach of Pogo's task order, causing Pogo to suffer damages.

107. For the reasons set forth above, Pogo is entitled to $761,214.74 plus interest from March 31, 2017, to the date of payment (or an amount to be proved at trial) as damages for MCB Camp Pendleton's diversion of its driver requirements to the TMO at Scott Air Force Base in Illinois instead of Pogo.

## Count 7

## (Breach of Implied Covenant of Good Faith and Fair Dealing: Breach of Duty to Cooperate by Failing to Update Driver Estimates During Task Order Performance)

108. Pogo incorporates by reference the allegations contained in paragraphs 1-70 *supra*.

109. During performance of the task order, MCB Camp Pendleton's driver requirements were dramatically lower than the driver and driver-hour estimates in the solicitation and resulting task order, and the Government's implied covenant of good faith and fair dealing required MCB Camp Pendleton to cooperate with Pogo by notifying it of the Marine Corps' lower actual requirements and updating the driver and driver-hour estimates to better reflect the changed requirements.

110. MCB Camp Pendleton's failure to cooperate with Pogo by updating the Marine Corps' driver and driver-hour estimates during task order performance so that Pogo could request an equitable adjustment breached the Government's implied covenant of good faith and fair dealing, causing Pogo to suffer damages. Through such failure, MCB Camp Pendleton specifically intended to injure Pogo.

111. For the reasons set forth above, Pogo is entitled to $761,214.74 plus interest from March 31, 2017, to the date of payment (or an amount to be proved at trial) as damages for MCB Camp Pendleton's breach of the Government's implied covenant of good faith and fair dealing in failing to update its driver and driver-hour estimates to better reflect the Marine Corps' lower actual requirements.

## Count 8

## (Breach of Implied Covenant of Good Faith and Fair Dealing: Breach of Duty Not to Hinder Pogo's Performance)

112. Pogo incorporates by reference the allegations contained in paragraphs 1-70 supra.

113. During the term of Pogo's task order, MCB Camp Pendleton utilized civil-service drivers ("blue shirts") on runs. In an effort to deprive Pogo's drivers of runs, the manager of the "blue shirts" at MCB Camp Pendleton (i.e., the civil-service driver supervisor) manipulated the run sheets to favor the "blue shirts" over Pogo's drivers. For example, the manager manipulated the run sheets so as to provide overtime to the "blue shirts" at the expense of the contract drivers. These actions significantly contributed to Pogo's contract volume being dramatically lower than the driver and driver-hour estimates in the solicitation and resulting task order.

114. MCB Camp Pendleton's "funneling" of work to the "blue shirts" and its assignment of excessive overtime to them breached MCB Camp Pendleton's duty under the Government's implied covenant of good faith and fair dealing not to hinder Pogo's performance, causing Pogo to suffer damages. Through these actions, MCB Camp Pendleton specifically intended to injure Pogo.

115. On two occasions in September 2016, MCAS Yuma representatives advised newly hired Pogo drivers that they could only expect to get one days' work and then "nothing else" for two to three weeks and that they were "wasting [their] time" waiting for work that was never going to materialize. The Yuma representatives also advised the new hires that the representatives had no idea why Pogo had hired them. On the first occasion, Pogo lost three drivers because of such comments. These actions – which were specifically intended to injure Pogo - breached the Government's implied covenant of good faith and fair dealing not to hinder Pogo's performance, again causing Pogo to suffer damages.

116. MCB Camp Pendleton frequently ordered drivers for runs but would cancel an order at the last minute, costing Pogo good will with its drivers and also running up unnecessary expenses. In one such instance, MCAS Yuma repeatedly ordered drivers for its multi-week WTI course but abruptly canceled orders for several days of training. Finally, in or about December 2016, the Military Expeditionary Force (MEF) at MCB Camp Pendleton began sending its driver requirements to the TMO at Scott Air Force Base in Illinois to fulfill driver requirements utilizing other contractors. These actions also hindered Pogo's performance, breaching the Government's implied covenant of good faith and fair dealing and causing damages to

43

Pogo. Through these actions, MCB Camp Pendleton specifically intended to injure Pogo.

117. For the reasons set forth above, Pogo is entitled to $761,214.74 plus interest from March 31, 2017, to the date of payment (or an amount to be proved at trial) as damages for MCB Camp Pendleton's breach of the Government's implied covenant of good faith and fair dealing not to hinder Pogo's performance.

## Count 9

### (Mutual Mistake of Fact)

118. Pogo incorporates by reference the allegations contained in paragraphs 1-70 supra.

119. Pogo pleads this count in the alternative.

120. MCB Camp Pendleton and Pogo entered into task order performance under a mutual mistake of fact that the driver and driver-hour estimates in the solicitation were based on and accurately reflected recent actual historical data.

121. Both MCB Camp Pendleton and Pogo were mistaken in their belief regarding the accuracy of the driver and driver-hour estimates, which later proved to be grossly erroneous.

122. Pogo relied on MCB Camp Pendleton's estimates of driver and driver-hour usage in the solicitation in pricing its 2014 quotation.

123. The driver and driver-hour estimates in the solicitation were incorporated into Pogo's task order.

124. MCB Camp Pendleton and Pogo's mistaken belief as to the accuracy of MCB Camp Pendleton's driver and driver-hour estimates constituted a basic assumption underlying the task order and had a material effect on task order performance.

125. Pogo was not responsible for the grossly inaccurate driver and driver-hour estimates, which caused Pogo to suffer damages.

126. Both Pogo – and apparently MCB Camp Pendleton – were unaware that the manager of the "blue shirts" was manipulating the run sheets to favor the "blue shirts" over BryMak's drivers, further degrading the accuracy of the solicitation estimates.

127. Due to MCB Camp Pendleton and Pogo's mutual mistake of fact, reformation of Pogo's task order is proper.

128. Under a reformation theory, and for the reasons set forth above, Pogo is entitled to $761,214.74 plus interest from March 31, 2017, to the date of payment (or an amount to be proved at trial) as damages due to MCB Camp Pendleton and Pogo's mutual mistake of fact as to the accuracy of MCB Camp Pendleton's driver and driver-hour estimates.

## Relief Requested

WHEREFORE, and for the reasons set forth above, Pogo respectfully requests that the Court grant the following relief:

129. Enter judgment in Pogo's favor on all nine counts in this Complaint.

130. Grant Pogo's appeal of the contracting officer's May 31, 2018, final decision denying Pogo's April 9, 2018, certified claim and order the United States - acting through the Department of Defense, Department of the Navy, and the Marine Corps - to pay Pogo's certified claim of $761,214.74 in its entirety (or an amount to be proved at trial) plus interest from April 9, 2018, to the date of payment.

131. Award costs and reasonable attorneys' fees to Pogo pursuant to Rule 54(d) of the Rules of the United States Court of Federal Claims and 28 U.S.C. § 2412.

132. Award Pogo such further relief as the Court may deem just and proper.

*John A. Howell*
_____
John A. Howell
Halloran & Sage LLP
1717 Pennsylvania Avenue, N.W.,
Suite 475
Washington, D.C. 20006
(202) 263-4971
Fax: (202) 496-9279
E-mail: howell@halloransage.com

Attorney for Pogo, Inc.

Dated: September 24, 2018